CITY OF CAMBRIDGE *vs.* DEPARTMENT OF TELECOMMUNICA-
TIONS AND ENERGY & another.[1]

Suffolk. September 6, 2007. - October 24, 2007.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, CORDY, & BOTSFORD, JJ.

*Municipal Corporations,* Electric plant. *Electric Company. Electricity. Depart-
ment of Telecommunications and Energy. Public Utilities,* Electric company.
*Administrative Law,* Judicial review, Agency's authority. *Words,* "Net
negative salvage value," "Unamortized investment."

A city's petition for appeal from a decision of the Department of Telecom-
munications and Energy (department) was timely filed within the appeal
period prescribed by G. L. c. 25, § 5, which had been extended by three
days due to the department's service of its decision by mail pursuant to
Mass. R. A. P. 14 (c). [870-871]

The Department of Telecommunications and Energy (department) properly
exercised its discretion and applied its expertise in concluding that where a
municipality elected to purchase street lighting equipment under G. L.
c. 164, § 34A, from an electric company from which it had received street
lighting service, the municipality's purchase price should include the cost
of removal of retired equipment [871-877]; further, the city failed to
demonstrate that the electric company provided inadequate accounting rec-
ords on the issue of the cost of removal [877-878].

CIVIL ACTION commenced in the Supreme Judicial Court for
the county of Suffolk on October 13, 2005.

The case was reported by *Greaney,* J.

*Paul S. Kawai* for city of Cambridge.

*Maryanne Reynolds Martin,* Assistant Attorney General, for
Department of Telecommunications and Energy.

*Robert J. Keegan (David S. Rosenzweig* with him) for the
intervener.

GREANEY, J. Under G. L. c. 164, § 34A, a municipality receiv-
ing street lighting service from an electric company may acquire

---

[1]Cambridge Electric Light Company, intervener, doing business as NSTAR
Electric.

all or part of the company's lighting equipment. The city of Cambridge (city) elected, under the statute, to purchase the municipal lighting equipment of the Cambridge Electric Light Company, doing business as NSTAR Electric (company). We now consider the appropriate method to use in calculating the city's purchase price, more particularly, the company's unamortized investment of the municipal lighting equipment. The Department of Telecommunications and Energy (department), which is directed to resolve disputes of this type, see G. L. c. 164, § 34A (*d*), concluded that the purchase price should compensate the company for its cost of removing retired lighting equipment. Pursuant to G. L. c. 25, § 5, the city filed a petition for appeal with the county court. A single justice reserved and reported the case, without decision, to the full court. We affirm the department's decision.

The background of the case is as follows. The company has provided electric service to the city, including street lighting service. The company's service territory was conterminous with the city's municipal boundaries. In 2003, the department approved an "alternative streetlighting tariff" for the city, establishing a rate to light the street lights in the event the city chose to purchase the company's lighting equipment pursuant to G. L. c. 164, § 34A.

In June, 2003, the city notified the company that it intended to acquire all of the company's municipal (not privately owned) lighting equipment.[2] The city and the company were unable to agree on the method for calculating the purchase price, specifically disagreeing as to the compensation due the company for its "unamortized investment, net of any salvage value obtained by the electric company under the circumstances, in the lighting equipment," G. L. c. 164, § 34A (*b*). The city objected to includ-

[2]The municipal lighting equipment included "the company's FERC [Federal Energy Regulatory Commission] Account 373 municipal street lighting facilities and equipment, municipal flood lighting and area lighting facilities and equipment, consisting of luminaires, lamps, ballasts, photocells, brackets, conductors from the luminaire to the distribution connection, dedicated poles where applicable, foundations, conduits, dedicated manholes where applicable, and other underground equipment that are not part of the distribution system." Privately owned lighting equipment, which was excluded from the purchase, consists of street lighting equipment owned by the company that is placed on private property for nonpublic purposes.

ing the cost of removal of *retired* lighting equipment in the calculation of the purchase price. The inclusion of this cost constituted "net negative salvage value," because the cost of removal of the retired lighting equipment significantly exceeded the salvage value of the removed equipment. Adding this cost resulted in a purchase price almost twice the price calculated by the city. If the cost is excluded, the parties' calculations of the purchase price were roughly equivalent. Despite the disagreement over the purchase price, the city executed a purchase and sale agreement with the company. The city agreed to pay the higher purchase price sought by the company, and the company agreed that it would refund to the city any overpayment determined by the department (or by this court).

The city filed a petition with the department requesting, pursuant to G. L. c. 164, § 34A (*d*), a decision on the appropriate compensation to be paid to the company for the lighting equipment. The department held an evidentiary hearing, after which the parties filed additional briefs. In a written decision dated September 19, 2005, the department ruled in favor of the company, concluding that the company's compensation properly included the cost of removal of retired lighting equipment. The city filed its petition for appeal with the county court, and the company was permitted to intervene. As has been stated, the single justice reserved and reported the case.

1. We first take up the timeliness of the appeal. The department argues that the city's appeal must be dismissed because (1) the city filed the original petition for appeal with it one day late; and (2) the city's electronic mail transmission, within the appeal period, of an electronic version of its petition for appeal to the department in accordance with the department's electronic filing system was insufficient to constitute a "filing." We need not address the latter ground for dismissal because the department has miscalculated the expiration date of the appeal period.

General Laws c. 25, § 5, governs the timing of appeals from any final decision of the department and provides, in relevant part:

> "Such petition for appeal shall be filed with the secretary of the [department] within twenty days after the date of service of the decision, order or ruling of the [department]

> . . . . The [department] shall serve such decision, order or ruling upon all parties in interest by mailing, postpaid, within one day of its being entered, and *service shall be presumed to have occurred in the normal course of delivery of such mail"* (emphasis added).

The twenty-day period begins the day after the department serves its decision, which is presumed to have occurred, and did occur here, by mail. See *id.* See also Mass. R. A. P. 14 (a), 365 Mass. 859 (1974) ("In computing any period of time prescribed by these rules, by order of court, or by any applicable statute, the day of the act, event, or default after which the designated period of time begins to run shall not be included"). When service is effected by mail, the appellate rules provide three additional days to the prescribed period. See Mass. R. A. P. 14 (c), 365 Mass. 859 (1974) ("Whenever a party is required or permitted to do an act within a prescribed period after service of a paper upon him and the paper is served by mail, three days shall be added to the prescribed period"). Application of this rule is appropriate here, and under the rule the city's petition was timely filed.

2. We turn now to the central issue, the appropriate method of calculating the city's purchase price for the lighting equipment. This issue is complex and novel, and analysis will be aided by an overview of the statutory background. General Laws c. 164, insofar as relevant here, governs the provision of electricity and electrical services in the Commonwealth. With the passage of the electric utility restructuring act, St. 1997, c. 164 (Act), the Legislature restructured the electric utility industry, establishing a framework for a competitive market for electric generation, while maintaining electric companies as exclusive service providers for distribution and transmission. See St. 1997, c. 164, § 1 (*f*); *Franklin W. Olin College of Eng'g* v. *Department of Telecommunications & Energy*, 439 Mass. 857, 858 (2003). See also *Shea* v. *Boston Edison Co.*, 431 Mass. 251, 253 (2000) (explaining three components of electric utility industry: generation, transmission, and distribution). Under the legislation, electric companies were encouraged to divest their generation assets to competitive market entities. See G. L. c. 164, § 1A (*b*). Also, commencing March 1, 1998, customers were provided

the choice of purchasing electricity from a regulated electric company or from a competitive generation supplier. G. L. c. 164, § 1A (*a*).

General Laws c. 164, § 34A, was enacted as part of the Act. See St. 1997, c. 164, § 196. Subsection (*a*) of § 34A authorizes municipalities to purchase lighting equipment owned by an electric company when the municipality has been "receiving street lighting service from an electric company pursuant to a tariff which provides for the use by such municipality of lighting equipment owned by the electric company." At its option and "upon 60 days notice to the electric company and to the department," a municipality may "convert its street lighting service from the subject tariff to an alternative tariff approved by the department providing for delivery service by the electric company of electric energy"; "purchase electric energy for use in such municipal lighting equipment from the electric company" or any other authorized provider; and "acquire, or compensate the electric company for, the lighting equipment of the electric company in the municipality in accordance with subsection (*b*)." G. L. c. 164, § 34A (*a*).

Subsection (*b*) of § 34A pertains to the compensation owed to the electric company for its lighting equipment and provides:

> "Any municipality exercising the option to convert its street lighting service pursuant to subsection (a) shall be required to compensate the electric company for its *unamortized investment, net of any salvage value obtained by the electric company under the circumstances*, in the lighting equipment owned by the electric company in the municipality as of the date the electric company receives notice of such exercise pursuant to subsection (a). In meeting this requirement, the municipality may acquire all or any part of such lighting equipment of the electric company upon the payment of the unamortized investment allocable to such acquired equipment. Upon such payment, the municipality shall have the right to use, alter, remove, or replace such acquired equipment in any way the municipality deems appropriate. In addition, the municipality may request that the electric company remove any unacquired part of such lighting equipment. Thereupon, the municipality shall pay to the electric company the cost of removal by the electric company, along with the unamortized invest-

ment allocable to such unacquired part, net of any salvage value attributable to the removed equipment." (Emphasis added.)

Pursuant to subsection (*d*) of § 34A, the department is authorized to resolve any disputes concerning "the compensation to be paid the electric company."

The department described how the company arrived at its purchase price, as well as the city's objection to the company's method of calculation:

"In calculating the purchase price, the [c]ompany subtracted the depreciation reserve for streetlighting equipment recorded on its books from the gross plant value (or original installed cost) recorded on its books to determine the net book value of all its streetlighting equipment. The [c]ompany stated that the gross plant value recorded on its books for streetlighting equipment is the net total of actual gross plant additions, retirements and transfers as reported in [FERC[3]] Account 373, Streetlighting and Signal Systems.[4] The [c]ompany explained that depreciation reserve is a function of actual construction costs incurred, [d]epartment-approved depreciation rates, actual asset retirements and cost of removal, and salvage value relating to any retired plant as reported in a subaccount of FERC . . . .

"The [c]ompany calculated net salvage value by subtracting the cost of removal from the salvage proceeds obtained from the removed equipment. The [c]ompany noted that the cost of removal is typically greater than the salvage received for the scrap material. The [c]ompany presented evidence that, during the last decade, the cost of removal for streetlight equipment in the [c]ity has been approximately four times greater than the value of gross

---

[3]FERC is a Federal agency that sets rates for electricity transmitted and sold at wholesale in interstate commerce. See *Eastern Edison Co.* v. *Department of Pub. Utils.*, 388 Mass. 292, 297 (1983). The department's regulations adopt the FERC uniform system of accounts for electric companies and the accompanying definitions, with certain modifications not relevant here. See 220 Code Mass. Regs. §§ 51.00 (1993).

[4]This component of the calculation is not a contested issue.

salvage and, therefore, the streetlighting equipment in the [c]ity has net negative salvage value . . . .

"The [c]ity disputed the [c]ompany's method for determining accumulated depreciation. Specifically, the [c]ity disputed the [c]ompany's inclusion of net negative salvage value in the determination of the reserve for accumulated depreciation.[5] Instead, the [c]ity proposed to calculate accumulated depreciation by multiplying the streetlighting equipment's gross plant balances by [d]epartment-approved depreciation rates and reducing the sum by the cost of the prior year's gross retirements . . . ." (Citations and footnote omitted.)

The city argues that the department erroneously interpreted G. L. c. 164, § 34A, and that the language of § 34A requires that the cost of removal of retired equipment be *excluded* from the purchase price of equipment in service. In support of this argument, the city asserts that, under § 34A, costs of removal are distinct from salvage value; the term "net" only may include deductions; and the phrase "under the circumstances," prohibits the inclusion of costs of removal of "retired equipment removed and disposed of many years ago."

We examine the city's position under the familiar standard governing review of petitions under G. L. c. 25, § 5:

"Our standard of review . . . is well settled: a petition that raises no constitutional questions requires us to review the department's finding to determine only whether there is an error of law. . . . The burden of proof is on the appealing party to show that the order appealed from is invalid, and we have observed that this burden is heavy. . . . Moreover, we give deference to the department's expertise and experience in areas where the Legislature has delegated

---

[5]As noted by the department, the city and the company agreed that accumulated depreciation must be subtracted from the gross plant value of the street lights to determine unamortized value; accumulated depreciation must be computed based on rates approved by the department; and the cost of actual asset retirements should be factored into the calculation of accumulated depreciation to the extent that such retirements are identifiable. In addition, the city and the company agree that one of the costs recoverable through the ordinary *ratemaking* process pursuant to G. L. c. 164, § 94, is net negative salvage value. This cost is recoverable from the company's customers.

to it decision-making authority, pursuant to G. L. c. 30A, § 14. We shall uphold an agency's decision unless it is based on an error of law, unsupported by substantial evidence, unwarranted by facts found on the record as submitted, arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law. G. L. c. 30A, § 14 (7)." (Citations omitted.)

*Massachusetts Inst. of Tech.* v. *Department of Pub. Utils.*, 425 Mass. 856, 867-868 (1997). Under this standard, the department properly exercised its discretion, and applied its expertise, in rejecting the city's arguments and in concluding that the company's recovery of "net negative salvage value" is a lawful component of "unamortized investment."

We begin by noting that G. L. c. 164 does not define the terms used in § 34A, such as "unamortized investment" or "salvage value." More importantly, the statute contains no valuation standard. The task of interpretation is thus left to the discretionary authority and expertise of the department. See *Wolf* v. *Department of Pub. Utils.*, 407 Mass. 363, 370 (1990). "Where, as here, the case involves interpretation of a complex statutory and regulatory framework, '[w]e give great deference to the department's expertise in areas where the Legislature has delegated its decision making authority.' " *MCI Telecommunications Corp.* v. *Department of Telecommunications & Energy*, 435 Mass. 144, 150-151 (2001), quoting *Stow Mun. Elec. Dep't* v. *Department of Pub. Utils.*, 426 Mass. 341, 344 (1997). The department reasoned that because the statutory term "unamortized investment" was not defined, it was to be calculated, as the company did, on the basis of customary calculations that included removal costs for retired lighting equipment.

The city overlooks the fact that § 34A deals with two situations where lighting equipment will be valued. In the first situation, a municipality chooses to purchase all of the municipal lighting equipment (this is the case here). In the second situation, a municipality may elect to purchase some of the lighting equipment and have the electric company remove the "unacquired part of such lighting equipment." G. L. c. 164, § 34A (*b*). The city's reliance on the language in § 34A (*b*), pertaining to the separate reference to "cost of removal," contains a directive concerning

valuation only in cases involving the second situation. The directive does not prohibit a pricing methodology that permits recovery of an electric company's cost of removal of retired lighting equipment when a municipality purchases all of the municipality's lighting equipment.

The city's reliance on the term "net" is not helpful to its argument. Section 34A does not contain language prohibiting the department from allowing the company to recover its "net negative salvage value" when calculating the company's compensation for its unamortized investment. The term "net" contemplates deductions when deductions exist, and the term permits deductions resulting in either a positive or a negative number. If the Legislature had intended that a municipality acquire lighting equipment only at a discount to the electric company's unamortized investment, it would have expressly so provided.

We reject the city's argument that the "under the circumstances" language in § 34A (*b*) requires the department to determine compensation in the present tense only. The contention improperly confuses the two situations (described above) where lighting equipment will be valued. Further, the decision whether "net negative salvage value" is a proper component of "accumulated depreciation," when there exists complete congruity between the company's service territory and the city's municipal boundary, is a matter appropriately left to the broad discretion of the department. The department reasoned that the city's valuation method would preclude the company from including an actual cost incurred in determining its unamortized investment, and would be inconsistent with the department's policy that cost responsibility follows cost incurrence. The department's analysis falls squarely within its expertise and broad authority, see *Fitchburg Gas & Elec. Light Co.* v. *Department of Telecommunications & Energy*, 440 Mass. 625, 627 (2004); *Boston Edison Co.* v. *Boston*, 390 Mass. 772, 774 (1984), and its decision is protected by the principle that it would not be "appropriate for this court to substitute its judgment for a judgment of the department regarding energy policy that cannot be said to be irrational." *Massachusetts Oilheat Council* v. *Department of Pub. Utils.*, 418 Mass. 798, 805 (1994). See *Attorney Gen.* v. *Department of Telecommunications & Energy*, 438 Mass. 256,

267 (2002), quoting *Attorney Gen.* v. *Department of Pub. Utils.*, 390 Mass. 208, 228 (1983) ("questions of policy are for an administrative agency").

Some final observations are in order. We agree with the department that the city's interpretation of § 34A (and not the department's decision) is inconsistent with the legislative intent and history of G. L. c. 164, because it attempts to shift costs of acquired lighting equipment from the purchaser of the system effectively to ratepayers or consumers in the form of a tariffed rate. See *Massachusetts Inst. of Tech.* v. *Department of Pub. Utils.*, *supra* at 872. We note further that the company's methodology was supported by expert testimony that the department was free to credit.[6] The department's decision is also consistent with Federal accounting practices for tracking plant investments. See 18 C.F.R. Part 101, at 365 (2006) (FERC instructions for Account 108, accumulated provision for depreciation of electric utility plant, which dictate that accumulated depreciation must include "the cost of removal [of the retired property]" and be "credited with the salvage value and any other amounts recovered, such as insurance").

3. We reject the city's contention that the department's conclusion — that the company provided adequate accounting records on the issue of its cost of net negative salvage value — is unsupported by substantial evidence. See *Boston Gas Co.* v. *Department of Telecommunications & Energy*, 436 Mass. 233, 237 (2002). There was expert testimony, and documentary evidence, on which the department relied, that was "adequate to support a conclusion." G. L. c. 30A, § 1 (6). The fact that the company made corrections to some of its records does not detract from the fact that there was a basis in the company's records for its calculations that ultimately were credited by the department. Further, the city overlooks the context in which certain records were created. The submissions on which the city relies were submitted to the department for the sole purpose of demonstrating how the city's lighting equipment calculation

---

[6]To the extent that the city submitted expert testimony contradicting the company's evidence, "the resolution of conflicting evidence is for the department." *Hingham* v. *Department of Telecommunications & Energy*, 433 Mass. 198, 209 (2001).

failed to account properly for negative net salvage costs and to reconcile the differences in the proposed purchase prices. The city also fails to acknowledge the testimony of the company's expert witness that recoveries are not calculated when determining "gross salvage" but, rather, later as a credit against costs of removal. Thus, the exclusion of recoveries does not establish that the company's figures did not derive from its actual audited books. The city has not met its burden of showing that the department's determination is unsupported by substantial evidence.

4. Judgment shall enter in the county court affirming the department's September 19, 2005, decision.

*So ordered.*